SAMUEL, Judge.
This suit, for personal injuries sustained by his minor daughter in a one-car automobile accident and for medical expenses allegedly incurred as a result thereof, was filed by plaintiff, individually and in his capacity as administrator of her estate. Named defendants were the father of the minor driver of the automobile[1] and his liability insurer, State Farm Mutual Insurance Company. Liability was admitted and the case went to trial only against the defendant insurer. Having reached majority, the daughter became a party plaintiff.
The matter was tried to a jury which rendered a verdict in the total amount of $7,829.41, consisting of stipulated medical expenses of $4,829.41 and $3,000 for personal injuries. The jury award was made the judgment of the court. Plaintiffs then filed a motion for an additur and, after a hearing thereon, the court ordered an addi-tur of $2,000 which was accepted by defendant but rejected by plaintiffs, so that the judgment rendered was for the amount of the jury verdict.
Plaintiffs have appealed. The sole issue is quantum insofar as general damages are concerned.
The daughter (hereinafter referred to simply as plaintiff) and her mother were the two lay witnesses who testified. Expert evidence was given by Dr. George N. Byram, Jr., an orthopedic surgeon, Dr. Humberto Otero, plaintiff’s family physician, Dr. Hamid Massiha, a plastic surgeon, Dr. David Weilbacher, a general and vascular surgeon, and Dr. Maria Palmer, a neurologist and psychiatrist.
The accident occurred when the defendant vehicle struck a curb, turned on its side and skidded some distance. The guest passenger had her right arm out of the window at the time. She testified she hit her head on the windshield and her chest on the dashboard and hurt her back and her right arm. The skin on her arm was raw and parts of the knuckle and wrist bone were exposed. She was taken to the emergency room at East Jefferson Hospital where x-rays were taken of her arm, head and chest. The arm was cleansed, placed in a solution and scrubbed; a east was applied, and she was given a sling and released.
Afterward she consulted her personal physician, Dr. Byram. He prescribed whirl *1148 pool treatment for the hand and arm five or six times for one week. Later she consulted Dr. Otero because she stated she was unable to swallow. He changed the dressing on her arm, took x-rays and an EKG and admitted her to East Jefferson Hospital, where she remained for a week while a battery of tests were performed. Dr. Weil-bacher performed some of the tests in connection with her problem swallowing. She later returned to Dr. Otero for a checkup because her back was hurting, and again returned to Dr. Byram for further whirlpool treatment.
Later, while being fitted for contact lenses, she fainted in the doctor’s office. After this episode, she again saw Dr. Otero who sent her to Lakeside Hospital where she had an EEG and a brain scan. Then she was referred to Dr. Palmer, who performed various neurological tests and prescribed phenobarbital three times per day. Plaintiff feels embarrassed and self-conscious and depressed about her problems. She was advised not to drive for one year, and she has been warned about the danger of drinking alcoholic beverages because of its reaction with the medicine.
She wore a glove, which came midway between the finger and the elbow, for about a year in connection with the injury to her arm, and had dermabrasion (a sandpaper like procedure) performed to reduce the scarring. The jury examined plaintiff’s arm and noted the scarring and discoloration of which she complained.
She is able to participate in normal activities, but wears long sleeve dresses because she is embarrassed about the pink discoloration. The testimony of plaintiff’s mother is similar to that of her daughter.
The medical evidence is as follows:
Dr. George N. Byram, Jr., an orthopedic surgeon, saw plaintiff on May 30, 1978. She complained of pain in the right arm. Following removal of the arm splint, the doctor noted a long superficial abrasion on the radial side of the forearm from the knuckles to the elbow. It was clean and healing satisfactorily. There was tenderness in the right wrist and about the meta-carpophalangeal joints, but no deformity. He reviewed the hospital x-rays and found no fracture. The arm was placed in a removable splint. She had whirlpool therapy, wound cleansing and dressing changes daily. He saw plaintiff on five occasions for therapy and dressing changes from May 31 to June 14, 1978. He last saw plaintiff June 16, 1978.
Dr. Humberto Otero, plaintiff’s family physician, first saw plaintiff on June 3, 1978. She complained of injuries to the right arm, ankle, head, chest and abdomen as a result of the car accident. He performed a physical examination and noticed the abrasions of the right arm and elbow. There was a decreased range of motion and minimal tenderness on palpation of the neck. He diagnosed her injuries as closed chest trauma and closed abdominal trauma (i.e., contusions in the muscles in the chest wall), but nothing organic other than the muscles. She was admitted to the intensive care unit of East Jefferson Hospital. Some tests and x-rays were performed in the doctor’s office, and during hospitalization (bone scans, x-rays, cardiac enzymes, electrocardiograms). All tests were negative. After two days, plaintiff was transferred from intensive care to regular care. She was hospitalized from June 3 to June 10, 1978. The diagnosis remained the same as it had been prior to hospital admission.
Plaintiff returned to Dr. Otero as an outpatient with the same complaints. She was examined, the dressing on her right arm was changed and she was referred to Dr. Book, an orthopedist, and Dr. Massiha, a plastic surgeon.
On July 13, plaintiff complained to Dr. Otero of mid-sternum chest pain that increased with exercise. An EKG was within normal limits. Analgesics and muscle relaxants were prescribed. She was last seen July 13, 1978. While hospitalized, she had also been seen by Dr. David Weilbacher, a general surgeon, and Dr. Serrato, a cardiologist.
Dr. Hamid Massiha, a plastic surgeon, saw plaintiff on June 15, 1978 relative to *1149 scars on her right forearm and dorsum of the right hand. He found a superficial second degree burn from the crease of the forearm to the crease of the hand and forearm and a deeper burn in the dorsum of the fingers and dorsum of the thumb. The burns on the dorsum of the hand were a different kind from which he expected hy-pertropic scarring (a thicker scarring) so the doctor ordered a stocking form of glove that holds constant pressure, to prevent a thick scar. She was ordered to avoid sunshine to prevent splotching.
She was seen again by Dr. Massiha on July 13,1978. The scar was raised and flat in relation to the normal skin layer. On August 10, there was scarring in the crease of the wrist and between the second and third fingers and in the dorsum of the thumb. The area from the wrist to the elbow was discolored but did not have much scarring.
Dr. Massiha also saw plaintiff on October 5, 1978, February 8, 1979 and August 14, 1979. He performed dermabrasion (a sandpaper procedure) on August 22,1979 in East Jefferson Hospital under general anesthesia. The procedure is painful. On August 28, the dressing was removed and the wound healed. She was seen again September 11, 1979, October 16, 1979 and March 25, 1980. On her last visit the scarring at the dorsum of the hand and one raised scar at the dorsum of the right wrist were still present. The wounds were healing well. They were still pink in color and plaintiff was advised to stay out of the sunshine.
This doctor testified plaintiff will have a permanent scarring or discoloration in the crease of the wrist, and small scarring in the space between the second and third fingers, and the dorsum of the thumb. The scar on the right wrist is about one centimeter wide, three centimeters long in the wrist and about two millimeters wide, and two or three centimeters long on the crease of the fingers.
Dr. David Weilbacher, a general and vascular surgeon, testified he saw plaintiff on June 4, 1978 in East Jefferson Hospital at the request of Dr. Otero regarding possible chest and abdominal surgery. He took a history wherein plaintiff told him she had been injured in an automobile accident nine days earlier. She denied any loss of consciousness. Physical examination was essentially normal except for minimal tenderness to pressure over the substernal area (the breast bone area). There was no rib tenderness and the remainder of the examination was normal. A series of gastrointestinal tests and an upper GI series was performed. These were normal. The GI series was performed to explore the possibility of an esophageal injury or esophagitis. She continued to complain of trouble swallowing. The tests were normal. She was examined from head to toe and all tests came back normal. She was last seen June 9, 1978. He concluded plaintiff had sustained a mild chest contusion, otherwise he had no explanation for the source of these complaints.
Dr. Maria Palmer, a neurologist and psychiatrist, examined plaintiff on August 23, 1978 at the request of Dr. Otero. She complained of loss of consciousness on August 18, 1978 while being fitted for contact lenses. A neurological examination and an electroencephalogram were performed. The latter showed an abnormality in the left temporal lobe which was described as a focal slowing. In obtaining plaintiff’s history she was certain plaintiff had lost consciousness, struck her head and face, and suffered many injuries in the car accident. She was hospitalized and, when she' recovered consciousness in the hospital, noted two knots on the left side of her head. She also suffered headaches after leaving the hospital. This doctor concluded plaintiff had a post traumatic seizure due to an injury to the brain following her head injury. Based on the history and description of symptoms plaintiff demonstrated while she was unconscious, the doctor also was of the opinion this was most likely due to trauma.
Treatment consisted of an anticonvulsant with phenobarbital. The patient was seen on regular follow-up visits on October 5, 1978, February 8 and September 10, 1979, *1150 March 27 and October 28,1980. After that, she was told to return in one year. Her only problem was that she was depressed. She was taking her medication and had no other complaints. The major side effect of phenobarbital is drowsiness. A person’s mood may be affected and they either may be depressed or hyper-excitable. It could be expected to last three to four weeks at the most. On all of the visits subsequent to the first, plaintiff had no seizures, the neurological examination was negative, she was still taking her medication, and had no complaints.
Dr. Palmer could not state how long plaintiff would be required to continue taking the medication. She proposed to stop the medication after five years, and if plaintiff then had no seizures the medication could be discontinued, otherwise she may have to be on medication forever.
It is clear from the award for personal injuries that the jury did not believe plaintiff proved all of her complaints were related to the accident. Obviously, their award would have been substantially higher if they had believed the incident at the eye doctor’s office was caused by the accident, or if they had accepted the testimony of Dr. Palmer. Nor do some of the numerous hospitalizations and tests, all of which were negative, appear to have been necessarily related to the accident.
Nonetheless, we are satisfied the award of $3,000 for plaintiff’s injuries is so low as to be manifestly erroneous. Certainly, some of her problems were caused by the accident. The painful dermabrasion procedure, the scarring (although somewhat minimal), the need to keep out of the sunshine, to wear the glove and long sleeves over an extended period of time, and the overall effect of the injuries on this teenage girl are sufficient to require a lower limit award of $15,000. We amend accordingly.
For the reasons assigned, the judgment appealed from is amended so as to increase the award for personal injuries from $3,000 to $15,000. As thus amended, and in all other respects, the judgment is affirmed.
AMENDED AND AFFIRMED.

. Individually and in his capacity as administrator of the estate of his minor son.